## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SUSQUEHANNA INTERNATIONAL GROUP, LLP
401 City Line Avenue
Bala Cynwyd, Pennsylvania

               Plaintiff,

      v.

ERIC HAUSLER
63 Chestnut Road
Verona, New Jersey

               Defendant.

Civil Action No.

### COMPLAINT

Plaintiff, Susquehanna International Group, LLP (together with its affiliated and related entities, "SIG"), by its undersigned counsel, brings this complaint to enforce a restrictive covenant and to enjoin Defendant, Eric Hausler, from violating that covenant.  In the alternative, plaintiff seeks damages against Hausler and in favor of SIG, including, but not limited to, lost profits, cost incurred by SIG in promoting Hausler, and loss of the benefit of SIG's contractual rights.

In support hereof, Plaintiff alleges as follows:

### THE PARTIES

1.      Plaintiff, Susquehanna International Group, LLP is a Delaware limited liability partnership with its principal place of business at 401 City Line Avenue, Bala Cynwyd, Pennsylvania.  SIG's partners are all juridical entities whose ultimate citizenship is either Delaware or Pennsylvania.

2.      Defendant, Eric Hausler ("Hausler") is an individual residing at 63 Chestnut Road, Verona, New Jersey.  Hausler is a citizen of the State of New Jersey.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because this action is between citizens of different states, and the amount in controversy is in excess of $75,000.

4.      This Court has personal jurisdiction over defendant Hausler, who expressly agreed to exclusive jurisdiction and personal jurisdiction in this Court in the employment agreement that is the subject of this action.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.  Additionally, pursuant to the agreement that is the subject of this action, Hausler has consented to venue in this Court.

## FACTS

6.      SIG is a leading institutional sales, research and market making firm, active in financial markets on four continents.

7.      SIG, either directly or through its subsidiaries and affiliates, is in the business of, among other things, providing institutional brokerage services, trading securities and other financial products, and providing industry and corporate research and analysis to its institutional brokerage customers.

8.      SIG has invested significant capital and management time in developing one of the industry's premier research departments, which employs approximately 30 senior analysts, who focus on specific industries and the companies therein.  This corporate research is used to attract and maintain institutional brokerage customers.

**Hausler's Duties with SIG**

9.      Hausler was employed by SIG as a senior analyst on the gaming industry from November 3, 2003 until August 31, 2005, when Hausler resigned.

10.     The gaming companies that Hausler researched and analyzed for SIG, or was preparing to research and analyze for SIG, include:

(a)      Alliance Gaming Corp. (AGI);

(b)      Ameristar Casinos Inc. (ASCA);

(c)      Argosy Gaming Company (AGY);

(d)      Aztar Corporation (AZR);

(e)      Boyd Gaming Corporation (BYD);

(f)      GTECH Holdings Corporation (GTK);

(g)      Harrah's Entertainment, Inc. (HET);

(h)      International Came Technology (IGT);

(i)      Las Vegas Sands Corp. (LVS);

(j)      Multimedia Games, Inc. (MGAM);

(k)      MGM Mirage (MGM);

(l)      Penn National Gaming Inc. (PENN);

(m)      Station Casinos, Inc. (STN);

(n)      WMS Industries Inc. (WMS);

(o)      Shuffle Master, Inc. (SHFL);

(p)      Pinnacle Entertainment, Inc. (PNK);

(q)      Wynn Resorts Ltd (WYNN); and

(r)      Isle of Capri Casinos Inc. (ISLE).

11.     SIG also had expended considerable effort preparing to launch research coverage on several companies in the leisure and recreation industry in the Fall of 2005 . Hausler, at SIG's direction, began preparing for this launch in the Spring of 2005 while employed by SIG. To assist Hausler in this regard, SIG hired an additional research associate for Hausler's team. The leisure and recreation companies that Hausler researched and analyzed and was prepared to launch research coverage on include:

    (a)     Winnebago Industries Inc. (WGO);

    (b)     Monaco Coach Corp. (MNC);

    (c)     Fleetwood Enterprises Inc. (FLE); and

    (d)     Thor Industries Inc. (THO).

12.     As a senior gaming industry analyst, Hausler performed extensive gaming company and industry research.  This research and reporting included traditional valuation of gaming industry securities, analysis of pro forma financial performance data, and forecasts of the gaming industry's overall economic trends.

13.     To enhance the quality of his reports and analysis, SIG ensured that Hausler had more than just paper data at his disposal.   Hausler participated in and coordinated numerous marketing and networking events, including on-site visits to casinos in Las Vegas, Atlantic City, and other locales.   These trips served multiple purposes:  they gave Hausler direct insight into the companies he analyzed; they provided Hausler with key contacts and relationships in those companies; and they helped to develop Hausler's reputation as a leading analyst of this sector.

## SIG's Investment in Hausler

14.     When Hausler was hired by SIG he was a little-known junior gaming industry analyst.  Hausler was not the main author on many, if any, industry or company reports.  Instead, Hausler's role was as a researcher or data gatherer, who supported the work of a senior analyst.

15.     Upon joining SIG, to enable Hausler to make the transition from a behind-the-scenes junior analyst to a known and respected senior gaming industry analyst, SIG placed Hausler in contact with its institutional brokerage customers and leading members of gaming industry firms.

16.     SIG invested significant time, resources, and capital to assist Hausler in cultivating relationships with gaming industry personnel and institutional brokerage customers by funding his attendance at over fifty-five marketing and networking events.

17.     Among Hausler's fully-funded marketing and networking events was a cross-country casino tour that included events in Brooks (California), Sacramento, Reno, San Diego, Las Vegas, Scottsdale/Phoenix, Oklahoma, Louisiana, Mississippi, Chicago, Connecticut, West Virginia and Atlantic City over a period of four weeks from May 9 through June 2, 2005.

18.     SIG made these investments because having a highly-regarded gaming industry analyst attracts more institutional brokerage business to SIG.

19.     SIG's investment paid off:  Hausler became one of the best-known gaming industry analysts, making appearances on television and receiving industry awards, including the Institutional Investor Up-and-Comer Analyst in the Gaming Sector Award.

20.     Only nine months after signing a two-year employment agreement, and less than two months after financing his cross-country casino tour, and while SIG was investing heavily in

Hausler's efforts to launch his coverage of leisure and recreation industry companies, Hausler gave less than one week's notice that he was abandoning SIG to work for a competitor.

## The Employment Agreement

21.     On October 23, 2003, Hausler was hired by SIG as a senior gaming industry analyst.

22.     At all times, Hausler's employment with SIG was governed by one of two employment agreements.

23.     The first employment agreement ran from November 3, 2003 through December 31, 2004, at which time it was superseded in part by the second employment agreement.

24.     Under the terms of his first employment agreement with SIG, Hausler was entitled to an annual salary of $150,000, a signing bonus of $75,000, and a discretionary bonus for the year ending December 31, 2004 of between $115,000 and $200,000.

25.     From November, 2003 through December, 2004, as a result of SIG's investment and promotion of Hausler, Hausler had progressed from an unknown junior gaming industry analyst to a well-known and respected senior gaming industry analyst.  Accordingly, Hausler's compensation was adjusted to reflect his enhanced status and to ensure that SIG would continue to reap the benefit of its significant investment in Hausler's reputation and career.

26.     To that end, on or about December 30, 2004, Hausler entered into a second employment agreement with SIG that was effective January 1, 2005 until December 31, 2006 (the "Agreement"), a true and correct copy of which is attached hereto as Exhibit A and incorporated herein by reference.

27.     Under this Agreement, Hausler's guaranteed salary was increased by over 30%
($50,000) to $200,000, and he was eligible for a discretionary bonus of between $175,000 and
$400,000 with an expected bonus of at least $250,000.  See Agreement at ¶ 3.

28.     The Agreement called for Hausler to devote his . . . "entire working time, energy,
skill and best efforts" to further SIG's business interests.  Agreement at ¶ 1.

29.     Over the course of his twenty-one months of employment with SIG, Hausler
received $589,583.28 in salary and bonuses along with a very competitive benefits package that
included, among other things, 401(k) participation and employer match, health insurance and life
insurance.

30.     In light of the highly competitive nature of the corporate research/analysis
industry and in light of the sizeable and on-going investment SIG would be undertaking to
promote Hausler, Hausler agreed "that until the later of the expiration of the Term [December
31, 2006] and the termination of [Hausler's] employment hereunder, [Hausler] shall not, without
the written consent of a Managing Director of SIG, directly or indirectly, in any manner or
capacity (as a stockholder, sole proprietor, officer, director, employee, partner, agent, consultant
or in any other corporate or representative capacity) engage (or assist or support any other person
or entity) in any activity (including the provision of corporate research) reasonably similar to
activities [Hausler] performs for SIG."  Agreement at ¶ 5.

31.     Hausler further acknowledged that the restrictions in Paragraph 5 of the
Employment Agreement "may limit his . . . ability to earn a livelihood in a business similar to
the business of SIG, but nevertheless believes that he . .  shall receive remuneration and other
benefits . . . sufficient to justify the restrictions contained" in the Agreement.  Agreement ¶ 6.

## Hausler's Employment with Bear Stearns

32.    Upon information and belief, Hausler is now employed with the Bear Stearns Companies ("Bear Stearns") as a senior analyst in the gaming and leisure and recreation industries providing corporate research to Bear Stearns' customers who trade in securities in these same sectors.

33.    Upon information and belief, Hausler's employment with Bear Stearns is "reasonably similar" to the work he did for SIG and, certainly, involves "the provision of corporate research." This activity is expressly barred by the Agreement.

34.    Hausler did not seek, and SIG did not grant, the written consent of any Managing Director of SIG for Hausler to directly or indirectly engage in research and/or analysis similar to the research and analysis Hausler performed at SIG with Bear Stearns or any other third party.

## COUNT I

## BREACH OF CONTRACT

35.    SIG incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 34.

36.    By his conduct as set forth above, Hausler has breached his Agreement with SIG.

37.    Hausler admits in the Agreement that his breach of the terms contained therein would cause SIG irreparable harm, Agreement at ¶ 9, for which SIG would have no adequate remedy at law.

38.    Hausler's breaches of the terms of the Agreement in fact have caused and will continue to cause SIG irreparable harm, for which SIG has no adequate remedy at law. The irreparable harm includes, but is not limited to, Hausler's ability to use the goodwill and reputation that SIG created and divert it to Bear Stearns -- a direct competitor of SIG.

39.     SIG will continue to suffer irreparable harm unless injunctive relief is granted by the Court.

40.     SIG is entitled to preliminary and permanent injunctive relief requiring Hausler to honor his Agreement because:  (1) SIG has a clear right to relief; (2) SIG has and will continue to suffer irreparable injury if an injunction is not granted; (3) granting of injunctive relief will not result in greater harm to Hausler; and (4) granting the injunctive relief will benefit the public interest.

**WHEREFORE**, SIG respectfully requests that this Court enter judgment in its favor and against Hausler for:

(a)     injunctive relief to prevent the continued breach or future breaches of the Agreement; or, in the alternative

(b)     award monetary damages against Hausler and in favor of SIG in an amount equal to the damages that the Court determines SIG has sustained as a direct and proximate result of defendant's actions, which damages exceed $100,000, including, but not limited to, lost profits, costs incurred by SIG in promoting Hausler, and the loss of the benefit of SIG's contractual rights; and

(c)     any such other relief as the court deems just and proper.


M. Norman Goldberger
Mathew A. White
Andrew C. Curley
Attorneys for Plaintiff,
Susquehanna International Group, LLP

Of Counsel:

WOLF, BLOCK, SCHORR and SOLIS-COHEN LLP
1650 Arch Street, 22nd Floor
Philadelphia, PA   19103-2097
(215) 977-2563

Dated:  September 21, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of September, 2005, I caused a copy of the foregoing

Complaint, together with its exhibits, to be served on counsel, by facsimile and Federal Express

delivery, as follows:

Steven Eckhaus
McCarter & English
245 Park Avenue
New York, NY 10167
Attorney for Eric Hausler

Andrew C. Curley

**<u>EXHIBIT A</u>**

# EMPLOYMENT AGREEMENT BETWEEN

## SUSQUEHANNA INTERNATIONAL GROUP, LLP

### and

### ERIC HAUSLER

This Agreement is entered into on this __30__ day of December, 2004 by and between Susquehanna International Group, LLP, a limited liability partnership formed and registered under the laws of Delaware with a principal place of business at 401 City Avenue, Bala Cynwyd, Pennsylvania 19004 (together with its related and/or affiliated entities, "SIG"), and Eric Hausler ("Employee"), an individual residing at 63 Chestnut Road, Verona, New Jersey 07044.

WHEREAS, SIG is engaged in, among other businesses, the provision of institutional brokerage services and the active trading of securities and other financial products;

WHEREAS, SIG provides research to its institutional brokerage customers; and

WHEREAS, SIG desires to employ Employee as a research analyst, and Employee desires to be employed by SIG as a research analyst, on the terms and conditions set forth in this Agreement.

WHEREFORE, the parties hereto, intending to be legally bound hereby, do agree as follows:

1.    <u>Employment</u>.  SIG agrees to employ Employee, and Employee agrees to be employed by SIG, on the terms and conditions set forth in this Agreement effective January 1, 2005 until December 31, 2006 (the "Term").  Prior to the commencement of the Term, Employee's employment with SIG shall continue to be governed by the Employment Agreement between SIG and Employee entered into on or about October 23, 2003, which agreement shall remain in full force and effect.  Employee will devote his or her entire working time, energy, skill and best efforts to further the business interests of SIG.  While employed by SIG, Employee shall maintain all required licenses and registrations and comply with all applicable laws, regulations, exchange requirements and SIG policies, procedures and guidelines.  SIG will be responsible for the costs associated with maintaining all required licenses and registrations.

2.    <u>Representation and Warranty</u>.  Except for SIG, Employee represents and warrants that he or she is not presently under a contract, written or oral, to provide corporate research services or any other brokerage services and further represents that neither the execution nor delivery of this Agreement or his or her contemplated services for SIG constitutes or will constitute a breach of any other contract of which Employee is subject.

3.    <u>Compensation</u>.  Employee shall receive compensation while employed by, and providing

December 7, 2004

services to, SIG under this Agreement as follows:

(a)      Employee shall receive a salary at a monthly rate equal to $16,666.67.

(b)      Employee shall be eligible to receive a discretionary bonus for each of calendar years ending December 31, 2005 and 2006. SIG expects that each of these discretionary bonuses will be determined at an annual rate between $175,000 and $400,000, with an average expected bonus of $250,000; provided that the discretionary bonus payable to Employee under this paragraph 3(b) in respect of each of calendar years 2005 and 2006 shall be not less than $175,000 (the "Minimum Amount"). The Minimum Amount in respect of a calendar year shall be pro rated if Employee is on a leave of absence from SIG (because of disability or otherwise) during such calendar year. The discretionary bonuses payable under this paragraph 3(b) (in excess of the Minimum Amount) refer only to those bonuses which may be awarded by SIG in its sole discretion. When determining whether to award such bonuses and the amount of such bonuses, SIG may consider such factors as it deems relevant, such as by way of example only, the overall performance of SIG and whether Employee's performance (as determined by SIG in its sole discretion) meets the standard of performance required by SIG. Employee understands that the bonus amounts payable pursuant to this paragraph 3(b) (in excess of the Minimum Amount) are entirely within the discretion of SIG and SIG retains the absolute, unfettered discretion to grant no bonus in excess of the Minimum Amount.

(c)      No salary or bonuses (including the Minimum Amount) will be paid under this paragraph 3 in the event Employee resigns or is terminated for Cause (as defined below) prior to the award and payment of such salary or bonus by SIG. All compensation (including bonuses) shall be paid in accordance with SIG's normal payroll policies as in effect from time to time and shall be net of any applicable withholding requirements.

(d)      Employee agrees and acknowledges that SIG may set off any amounts that he or she may hereafter owe to SIG against any amounts payable by SIG to him or her under this Agreement or otherwise.

4.      Termination.   During the Term, SIG may terminate Employee's employment for Cause (as defined below) by providing Employee notice of the effective date of such termination (which effective date may be immediately). For purposes of this Agreement, "Cause" means a determination by SIG that Employee failed to act in good faith, in furtherance of the business interests of SIG or in accordance with the terms set forth in this Agreement or the standards of conduct and performance adopted by SIG generally for its employees, including by way of example only, any of the following: (i) a willful failure by Employee to perform his or her duties hereunder (including neglect of such duties); (ii) conduct by Employee that is materially injurious to SIG, monetarily or otherwise; (iii) a breach by Employee of any of his or her material obligations under this Agreement; (iv) Employee engaging in any criminal activity or other activity involving moral turpitude; or (v) any conduct by Employee involving significant undisclosed conflict of interest, serious impropriety, breach of corporate duty or misappropriation of any money or other assets or properties of

SIG or any other party with which SIG does business. In the event Employee resigns or is terminated for Cause, neither SIG nor Employee shall have further obligations or liabilities hereunder, except: (a) SIG shall pay Employee, in accordance with SIG's normal payroll practices, all accrued but unpaid salary through such termination date; and (b) the provisions of paragraphs 5 through 14 shall remain in full force and effect. In the event that on or before December 31, 2006, SIG terminates Employee without Cause, neither SIG nor Employee shall have further obligations or liabilities hereunder, except that (a) after the termination date the provisions of paragraphs 6 through 14 shall remain in full force and effect, and (b) SIG shall pay Employee in accordance with SIG's normal payroll practices, his or her salary pursuant to paragraph 3(a) until the earlier of the end of the Term and the occurrence of an Early Termination Event (as defined below), and (ii) so long as an Early Termination Event has not occurred prior to the end of the Term, for each of calendar years 2005 and 2006, the unpaid Minimum Amount(s) provided for pursuant to paragraph 3(b). Any payments under clause (ii) above shall be made on the date that SIG generally pays bonuses to its employees for the applicable calendar year. An Early Termination Event shall occur if Employee, directly or indirectly, in any manner or capacity, engages in any activity (including the provision of corporate research)) reasonably similar to activities that Employee performed for SIG. Employee shall have an affirmative obligation to inform SIG in advance of the occurrence of an Early Termination Event that occurs prior to the end of the Term.

     5.   <u>Exclusive Employment</u>. In addition to other valuable consideration received by Employee, Employee acknowledges and recognizes the highly competitive nature of SIG's business and that as an Employee of SIG he or she shall have access to SIG trade secrets (as defined in the Uniform Trade Secrets Act) and other Confidential Information. Employee accordingly agrees, that until the later of the expiration of the Term and the termination of Employee's employment hereunder, Employee shall not, without the written consent of a Managing Director of SIG, directly or indirectly, in any manner or capacity (as a stockholder, sole proprietor, officer, director, employee, partner, agent, consultant or in any other corporate or representative capacity), engage (or assist or support any other person or entity) in any activity (including the provision of corporate research) reasonably similar to activities that Employee performs for SIG.

     6.   <u>Acknowledgments</u>. Employee understands that the provisions of paragraph 5 hereof may limit his or her ability to earn a livelihood in a business similar to the business of SIG, but nevertheless believes that he or she shall receive remuneration and other benefits hereunder sufficient to justify the restrictions contained in such provisions. Employee also acknowledges that because SIG's business is international in scope the restrictions set forth in this Agreement are reasonable in geographic scope, even

though not limited to any particular area or market, and that, given his or her education, skills and abilities, these restrictions would not prevent him or her from earning a living. Employee recognizes that SIG would not employ Employee if Employee were not willing to agree to Paragraph 5. Employee further acknowledges that he or she shall not have the right to inspect or review or audit the books or records of SIG.

7.      Modification By Court. If for any reason a forum of competent jurisdiction shall find the provisions of paragraph 5 hereof unreasonable in duration, in geographic scope and/or in any other aspect, the prohibitions contained herein shall be restricted to such time and geographic areas and in such other manner as such court determines to be reasonable. Such restriction shall apply only to the operation of such provisions in the particular jurisdiction in which such adjudication is made.

8.      Time. The length of time stated in Paragraph 5 (at least through December 31, 2006) shall not run during any period that Employee is in violation of any of the terms of Paragraph 5 and shall be extended for the period of any such violation.

9.      Remedies. Employee acknowledges that SIG would be irreparably harmed if Employee were to breach any of the terms of this Agreement and, therefore, agrees that SIG shall be entitled to injunctive relief to prevent any breaches or threatened breaches of this Agreement and to specific performance of its terms as well as any other legal or equitable remedies it may have.

10.      Survival. The obligations of the Employee under Paragraphs 5 through 14 shall survive the termination of Employee's employment with SIG.

11.      Severability. If any one or more of the provisions or part of a provision contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity or enforceability of this Agreement in any other jurisdiction or any other provision or part of a provision of this Agreement, but this Agreement shall be reformed and construed in such jurisdiction as if such invalid or illegal or unenforceable provision or part of a provision had never been contained herein and such provision or part reformed so that it would be valid, legal and enforceable in such jurisdiction to the maximum extent possible.

12.      Successors. This Agreement shall not be assigned by Employee or by SIG except that SIG may assign this Agreement in the event of a change in control or sale of SIG in which case this Agreement shall inure to the benefit of SIG's successors and assigns.

13.      Governing Law. This Agreement and questions relating to its validity, interpretation, performance and enforcement shall be governed and construed according to the laws of the Commonwealth of Pennsylvania. Employee and SIG submit to the exclusive jurisdiction of the state courts

-4-

located in Montgomery County, Pennsylvania and to the Federal courts located in Philadelphia, Pennsylvania as to all actions and proceedings relating in any way to this Agreement that are not determined by arbitration pursuant to the Dispute Resolution Agreement referred to below. Employee and SIG further agree that such courts shall have personal jurisdiction over each of them and are a proper venue and a convenient forum with respect to all such actions or proceedings.

14.   Entire Agreement.  This Agreement, together with the Confidential Information Agreement, Non-Interference Agreement and Dispute Resolution Agreement, executed by the Employee as a condition of his or her employment, the terms of which are incorporated by reference herein, contain the entire understanding among the parties with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understanding, inducements of conditions, express or implied, oral or written except as herein contained. This Agreement may not be modified or amended, other than by an agreement in writing signed by the parties.

Sincerely,

Thomas Kennedy, Director
For Susquehanna International Group, LLP

Agreed and Accepted:

ERIC L. HAUSLER

Dated:  12/30/04